# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                    CHAPTER 11

**SHERWOOD FARMS, INC.**                  CASE NO.  6:10-bk-00578-KSJ

Debtor.

_____ /

## JOINT DISCLOSURE STATEMENT
## SUBMITTED BY DEBTORS
## SHERWOOD FARMS, INC.
### And
## SHERWOOD INVESTMENTS OVERSEAS LIMITED, INCORPORATED

COUNSEL FOR DEBTOR AND DEBTOR-IN-POSSESSION

R. SCOTT SHUKER, ESQ.
VICTORIA KOTHARI, ESQ.
LATHAM, SHUKER, EDEN & BEAUDINE, LLP
390 N. ORANGE AVENUE, SUITE 600
ORLANDO, FLORIDA, 32801

July 23, 2010

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                    CHAPTER 11

SHERWOOD FARMS, INC.                      CASE NO.  6:10-bk-00578-KSJ

              Debtor.
_____ /

JOINT DISCLOSURE STATEMENT
SUBMITTED BY DEBTORS
SHERWOOD FARMS, INC.
And
SHERWOOD INVESTMENTS OVERSEAS LIMITED, INCORPORATED

## I.    INTRODUCTION AND SUMMARY

This Joint Disclosure Statement ("Disclosure Statement") is filed pursuant to the requirements of §1125 of Title 11 of the United States Code (the "Code"). This Disclosure Statement is intended to provide adequate information to enable holders of claims in the above-captioned bankruptcy case ("Bankruptcy Case") to make informed judgments about the Joint Plan of Reorganization (the "Plan") submitted by Sherwood Farms, Inc. ("Sherwood Farms"); and Sherwood Investments Overseas Limited, Inc. ("Sherwood Investments") (each a "Debtor," and collectively, the "Debtors"). The Debtors are soliciting votes to accept the Plan. The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to all stakeholders. The Debtors believe that the Plan provides the best means currently available for their emergence from Chapter 11 and the best recoveries possible for holders of claims and interests against the Debtors, and thus strongly recommend that you vote to accept the Plan.

**THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN.  THIS INTRODUCTION AND SUMMARY IS**

QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTORS IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE WHICH ARE OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTORS' BUSINESSES AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE DEBTORS' CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

Sherwood Farms, and its parent company, Sherwood Investments are debtors under Chapter 11 of the Code in bankruptcy cases pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court").

As prescribed by the Code and the Rules, Claims asserted against, and Equity Interests in, the Debtors are placed into "Classes". The Plan designates nine (9) separate classes of Claims and Interests. The Plan contemplates paying these classes of Claims over time. The Plan also provides that the Debtors' membership and equitable interests will remain Unimpaired.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtors are altered, modified or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired", and the holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan ("Ballot") will be mailed along with the order approving this Disclosure Statement.

> **THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE <u>RECEIVED</u> AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

| **VOTING DEADLINE** |
| --- |
| The last day to vote to accept or reject the Plan is _____, 2010. All votes must be received by the voting agent by 5:00 p.m. (EST) on that day. |

Upon receipt, the Ballots will be tabulated, and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail in Section IV of this Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court will schedule a hearing (the "Confirmation Hearing") to consider whether the Debtors have complied with those requirements.

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called "cramdown." As described in greater detail in Section IV of this Disclosure Statement, Debtors have expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

## II.   DESCRIPTION OF DEBTORS' BUSINESSES

### A.   Commencement of the Cases

On January 15, 2010 ("Petition Date"), Sherwood Farms and Sherwood Investments filed voluntary petitions for reorganization under Chapter 11 of the Code in the United States Bankruptcy Court for the Middle District of Florida. No trustee has been appointed in either of the Bankruptcy Cases. The Debtors continue to operate their respective businesses as a debtor-in-possession under Sections 1101 and 1108 of the Code (Case No. 6:10-bk-00578, Doc. No.1 & Case No. 6:10-bk-00584, Doc. No.1, respectively).

### B.   General Background.

Sherwood Investments is a British Virgin Islands corporation in the business of managing investments for at least 14 years and, in recent times, has specialized in United States public companies with a value of less than $500 million. Sherwood Investments is an entity wholly-owned by the Johanna Benscher Family Settlement, a trust formed in Liberia. Sherwood Investments carries on the business of investing and dealing in shares on its own account and also managing shareholding portfolios on behalf of others. It has managed money for third parties, advised on the creation of derivative products, and managed its own funds. Sherwood Investments was registered with the State of Florida in 2004 as a foreign profit corporation.

In 2001 and 2002, Sherwood Investments provided substantial loans (the "SIO Loans") to Sherwood Farms' predecessor company, American Mercantile Corporation ("AMC") and certain related and affiliated parties"[1]. In conjunction with SIO Loans, Sherwood Investments secured its financial risk through various means including, in relevant part, by the execution of the Pledge Agreement.

Ultimately, AMC and its Affiliates defaulted on SIO Loans and Sherwood Investments exercised its right, pursuant to the Pledge Agreement, to obtain the pledged shares. As a result of the default, Sherwood Investments acquired management and voting control of AMC, Pacific and Select. Shortly after acquiring control of AMC, Pacific and Select, Sherwood Investments learned that the financial straits of each entity necessitated reorganization under Chapter 11 (the "2004 Bankruptcy").[2]

Sherwood Farms' Business

After the 2004 Bankruptcy, AMC changed its name to Sherwood Farms but continued AMC's business, namely, the cultivation and sale of orchids to wholesalers and flea markets. Over the years, Sherwood Farms developed both significant orchid growing expertise, and as a consequence, a valued customer list. Sherwood Farms specializes in growing the "Dendrobium" variety of orchids and is one of the largest growers of this variety in the U.S.

---

1    Between April 2001 and July 2002, Sherwood Investments made various loans totaling in excess of $10 million dollars to Yasuhiko Tominaga ("Tominaga"), the previous owner, director and president of Japan Pacific Trading Corp. ("Pacific"); Florida Select Citrus, Inc. ("Select") (Tominaga, Pacific and Select, collectively, the "Affiliates") and AMC. In connection with the loans, Tominaga, Pacific, Select and AMC executed various loan and security documents in favor of Sherwood Investments (the "Loan Documents"). The Loan Documents included an Amended and Consolidated Stock Pledge and Escrow Agreement (the "Pledge Agreement").
2    On October 7, 2004, Japan Pacific Trading Corporation, (Case No. 6-04-bk-11049), Florida Select Citrus Inc. (Case No. 6-04-bk-11050); and American Mercantile Corporation (Case No. 6-04-bk-11052) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida.

Sherwood Farms' corporate offices, greenhouses and warehouse sit upon 238 acres of land in Groveland, Florida (the "Property"). The Property consists of approximately 150 acres of usable land and features 16 acres of greenhouses. The land also includes a small office facility along with some warehouse storage area. Within the greenhouses, Sherwood Farms has approximately 800,000 orchids. Sherwood Investments, as the parent company, has historically supplied Sherwood Farms with necessary operating capital.

As of the Petition Date, Centennial Bank ("Centennial") f/k/a Old Southern Bank claimed a first priority[3] security interest in the assets of Sherwood Farms. The face amount of the obligation is approximately $5,450,000.00. Pentagon Apollo, Ltd. ("Pentagon Apollo") claimed a second priority security interest in the Property and other assets of Sherwood Farms and is owed approximately $4,050,000.00. Finally, Sherwood Investments has a third priority security interest in the Property and is owed approximately $4,800,000.00.

Neither of the security interests held by Centennial and Pentagon have been foreclosed, although the payments to both mortgage holders are in default. As of the Petition Date, Sherwood Farms also has several unsecured priority claims consisting largely of approximately $45,000.00 in tax obligations, a related party loan in the approximate amount of $1,070,000.00, and an additional $275,000.00 in unsecured non-priority claims owed to other trade creditors.

Sherwood Investments' Business

In late April 2006, Sherwood Investments, upon the advice and at the direction of Julian Benscher ("Benscher"), established a commercial relationship with ABN AMRO Bank N.V. ("ABN"), a bank incorporated in the Netherlands, with a branch in London, England. Although the

parties never signed a master agreement to govern their relationship, they engaged in a consistent course of conduct, from April 2006 through September 2008, that effectuated and carried out the trading relationship pursuant to the parties' intentions.

Sherwood Investments managed certain capital on behalf of Pentagon Capital Management PLC ("Pentagon Capital"), an FSA regulated investment manager incorporated in England and Wales (the "PC Investments"). The PC Investments took the form of both equity and debt funding.

As of the Petition Date, Pentagon Apollo has a secured claim in Sherwood Investments for approximately $5,850,000.00[4]. The loans upon which this claim is based are currently in default. Sherwood Investments also has several unsecured claims totaling approximately $6,600,000.00. Sherwood Investments is uncertain as to the market value of its assets. But for the actions of ABN, the underlying securities held by Sherwood Investments would have been of significant value. The actions of ABN caused the securities held by Sherwood Investments to become worthless and forced the liquidation by UBS of other derivative positions that relied to varying extents on the value of the ABN-held securities. Sherwood Investments is in the process of determining the extent of its losses.

<u>Significant Developments and Events Leading to Chapter 11 Filing.</u>

Beginning in early to mid-September 2008, financial markets experienced tremendous instability and events unfolded that no one could have predicted or foreseen just the month before. On September 15, 2008, Lehman Brothers, one of the world's largest investment banking firms, filed for bankruptcy and it closed its doors shortly thereafter. This was the largest bankruptcy in U.S. history. On September 16, 2008, the Federal Reserve Bank gave an $85 billion credit facility to

---

3  As discussed later in the Disclosure Statement, Pentagon Apollo provided post-petition debtor-in-possession financing (the "DIP Loan") to Sherwood Farms. Pentagon Apollo was granted a priming lien with respect to the DIP Loan, Centennial and Pentagon Apollo's relative positions were moved to second and third positions, respectively.
4  Approximately, $4,050,000.00 of this amount is based upon a guaranty of Sherwood Farms indebtedness to Pentagon Apollo.

American International Group (AIG) in order to prevent AIG's collapse. This was the largest government bailout of a private company in U.S. history. Stock markets around the world were in turmoil. The New York Stock Exchange suffered one-day losses that had not been seen since 9/11. Following Lehman's collapse, the last two major U.S. investment banks, Morgan Stanley and Goldman Sachs, appeared vulnerable and took radical steps (including converting from investment banks to bank holding companies regulated by the Federal Reserve) in order to avert their own demise.

The Royal Bank of Scotland Group ("ABN")[5] also faced severe financial problems, in part due to massive costs and liabilities associated with its purchase of ABN in October 2007. Ultimately, beginning in October 2008, the British Government infused tens of billions of dollars of new capital into ABN, in return for what is today a 70% public ownership interest.

The unprecedented financial crisis facing banks like ABN in September 2008 in no way excuses ABN for the actions that it took during the last two weeks of that month which destroyed its trading relationship with Sherwood Investments and caused tens of millions of dollars in damages to Sherwood Investments. Rather, the crisis that threatened the stability (and survival) of financial institutions worldwide provides a larger context for the reckless and wrongful conduct by ABN that is described below.

In a matter of days, ABN closed all of Sherwood Investments' trading positions and appropriated all remaining Sherwood Investments cash, despite Sherwood Investments' timely infusions of additional payments that ABN "purportedly agreed to accept" to settle "live" and "open" trades. In addition to keeping all of the sales proceeds, by liquidating all of Sherwood Investments'

---

5 ABN AMRO Bank was subsequently acquired by the Royal Scotland Bank, Santander, and the Dutch government. However, to avoid confusion, throughout this Disclosure Statement the entity will be referred to as "ABN."

trading positions in this manner, ABN triggered even greater falls in the respective stocks' prices. In just a matter of days, **eighteen million dollars** of Sherwood Investments capital with ABN had been reduced to **zero**.

Moreover, due to ABN's actions, Sherwood Investments suffered consequential damages with respect to obligations owed by Sherwood Investments to UBS and to Pentagon Capital pursuant to the terms of their respective business relationships. In fact, Sherwood Investments' banking relationship with UBS was effectively destroyed, causing further losses to Sherwood Investments.

The ripple effects of ABN's actions also significantly impaired Sherwood Investments' ability to support Sherwood Farms and ultimately, caused Sherwood Investments such a massive financial hardship that both Sherwood Investments and Sherwood Farms, its wholly-owned subsidiary, were forced into bankruptcy. Specifically, the actions of ABN caused the immediate withdrawal of third-party funds being managed by Sherwood Investments and the inability of Sherwood Investments to support its wholly-owned U.S. subsidiary, Sherwood Farms. In addition, the general deterioration in the U.S. economy has caused a decline in overall consumer spending and, thus, a reduction in sales for the Sherwood Farms. Furthermore, due to a period of abnormally cold weather, Sherwood Farms' sales came to a virtual halt, while heating costs soared from an average of $16,000.00 monthly to $16,000.00 weekly, in the weeks prior to filing these Bankruptcy Cases.

In consideration of the issues described above, the Debtors decided that reorganizing under Chapter 11 was in the best interest of all parties. Consequently, on October 13, 2009, ("Petition Date") the Debtors filed voluntary petitions for relief under Chapter 11 of the Code in the Middle District of Florida. The breaches by ABN described above will be addressed through the filing of an adversary proceeding in this bankruptcy case.

C.    Events Subsequent to Chapter 11 Filing

Since the Petition Date, the Debtors have continued to operate their businesses as debtors-in-possession under Section 1107(a) and 1108 of the Code. The Debtors sought and obtained an order, pursuant to Section 327 of the Code, from the Bankruptcy Court authorizing the Debtors to retain Latham, Shuker, Eden & Beaudine, LLP as Debtors' counsel (Sherwood Farms, Doc No. 43), and as Debtors' Special Litigation Counsel in Sherwood Investments (Sherwood Investments, Doc. No.41).

On January 19, 2010, the Debtors filed Emergency Motions for a Debtor-in-Possession Loan (Sherwood Farms, Doc. No. 12 and Sherwood Investments, Doc. No. 10). On February 17, 2010, the Court entered its final orders approving the Pentagon Apollo ("DIP Lender") Debtor-in-Possession Loan in the amount of $350,000.00 ("DIP Loan") and providing liens, security interests and super-priority claims to the DIP Lender (Sherwood Farms, Doc. No. 39 and Sherwood Investments, Doc. No. 37).

On February 12, 2010, Sherwood Investments filed an Application to Employ Frank M. Wolff and Wolff, Hill, McFarlin & Herron as Debtor's Counsel (Sherwood Investments, Doc. No. 32). On February 23, 2010, the Court entered an Order approving the employment of Wolff, Hill, McFarlin & Herron (Sherwood Investments, Doc. No. 40).

On April 1, 2010, Sherwood Farms filed an Application to Employ Richard Pilhorn and Osburn Henning & Co. as Accountants (Sherwood Farms, Doc. No. 46) which was approved by the Court and an order was entered on April 15, 2010 (Doc. No. 49).

On May 17, 2010, the Debtors filed respective Motions to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement (Sherwood Farms, Doc. No. 55 and Sherwood Investments, Doc. No. 49).

On June 30, 2010, an order was entered extending Sherwood Farms exclusivity period through and including July 23, 2010 (Sherwood Farms, Doc. No. 66). On July 14, 2010, Sherwood Investments was granted an extension of its exclusivity period though and including September 1, 2010 (Sherwood Investments, Doc. No. 64).

On June 4, 2010, Sherwood Investments filed its Complaint commencing an adversary proceeding against The Royal Bank of Scotland N.V., f/k/a ABN AMRO Bank, Case No. 6:10-ap-00158-KSJ (Sherwood Investments, Doc. No. 55) (the "ABN Adversary").

On July 9, 2010, ABN filed a notice with the Court stipulating that the parties have agreed that ABN shall have an extension through and including August 3, 2010 to respond to the Complaint (ABN Adversary, Doc. No.12).

## III.    THE PLAN

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF DEBTORS' PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

A.    Overview.

In summary, the Reorganized Debtors will continue to operate their existing businesses with low operating expenses. The Reorganized Debtors shall execute new notes, mortgages, and security agreements with Centennial Bank, f/k/a Old Southern Bank based, in part,

on adjusted property values that more accurately reflect the reduced market value of the lender's secured interest in its collateral (collective, the "New Secured Obligation"). The Debtors believe the cash flow generated from its core operations along with a reduction in cash flow demands from the New Secured Obligations shall be sufficient to cover the respective Reorganized Debtors' Plan Payments. Sherwood Farms shall continue to maintain its business, and shall continue to sell orchids in the ordinary course.

The Allowed Secured Claims will be paid and treated as set forth below and under the Plan. Allowed Priority Claims will be paid out over time, and Allowed Unsecured Claims will be paid and treated as set forth below. As the Equity Interest Holders are not impaired, they will retain its membership interests in the Debtors.

All Claims against the Debtors shall be classified and treated pursuant to the terms of the Plan. As noted more fully below, the Plan contains nine (9) Classes of Claims and Interests. There are five (6) Classes of Secured Claims, one (1) Class of Unsecured Claims, and two (2) Classes of Equity Interests.

Overall, the Plan provides that Holders of Allowed Administrative Claims will be paid in full on the Effective Date. Holders of Allowed Priority Tax Claims will receive Cash Payments over a period not to exceed five (5) years after the date of the assessment of the Claim of a value, as of the Effective Date of the Plan, equal to the Allowed Amount of the Claim. The Debtors will pay interest on such Claims at the Statutory Rate. The Debtors estimate that the filed amount of Priority Tax Claims is approximately $45,000.00.

The Holder of Allowed Secured Claims in Classes 1 to 6, to the extent they have Allowed Claims, will receive payment equal to one hundred percent (100%) of their Allowed

Secured Claims, over time, on the terms as set forth below. Holders of the Allowed Unsecured Claims in Class 7 shall receive, in full satisfaction of their Allowed Unsecured Claims, *Pro Rata* distribution from the Net Adversary Proceeds. Class 8 and 9 Equity Interests are unimpaired, since upon the Effective Date, all currently issued or authorized Equity Interests in the Debtors shall remain unchanged. All Classes, except Classes 8 and 9, are impaired under the Plan.

    B.    <u>Classification and Treatment of Claims</u>.

        1.    <u>Priority Claims</u>.

            a.    <u>Administrative Expense Claims</u>.

Holders of all Allowed Administrative Expense Claims of the Debtors shall be paid in full on the Effective Date, or, if the Claim does not become Allowed prior to the Effective Date, on the date the Allowed Amount of such claim is determined by Final Order of the Bankruptcy Court. However, nothing in this provision of the Plan shall preclude Debtors, the Reorganized Debtors from paying any holder of a Nonordinary Course Administrative Claim less than one hundred percent (100%) of its Allowed Claim in Cash on the Effective Date provided that such Claim holder consents to different payment terms. Debtors estimate Administrative Claims to be approximately $50,000 (excluding any amounts owed under the DIP Loans).

            b.    <u>Priority Tax Claims</u>.

Except to the extent that the Holder and the Debtors have agreed or may agree to a different treatment, each Holder of an Allowed Priority Tax Claim shall be paid by the Debtors, or Reorganized Debtors, as applicable, payments equal to the Allowed Priority Tax Claim, which will be paid based on a five (5) year amortization and maturity with interest at the applicable statutory rate; the payments will be made quarterly. Payments will commence on the later

of the Effective Date or on such date as a respective Priority Tax Claim becomes Allowed. The Debtors estimate that the filed amount of Priority Tax Claims is approximately $45,000.

2.     <u>Secured Claims</u>.

a.     <u>Class 1 – Pentagon Apollo DIP Lender (SF)</u>.

Class 1 consists of the Allowed Secured Claim of Pentagon Apollo in respect of its DIP Loan to Sherwood Farms. The Claim is secured by a superpriority mortgage lien upon and security interest in all assets of Sherwood Farms (collectively, the "DIP Lender's Property"). DIP Lender shall retain a superpriority lien on, among other things, all Sherwood Farms' real and personal property.

In full satisfaction of its Allowed Class 1 Claim, DIP Lender shall have a lien as stated above and receive a new secured note (the "DIP Lender Note") in the amount of the Allowed Class 1 Claim. The new note shall be paid through the proceeds of core operations and causes of action. A copy of the proposed new note and mortgages shall be available at least ten (10) days prior to the Confirmation Hearing and will be provided to any party who requests such.

The DIP Lender Note shall be in the amount of its Allowed Secured Claim. From Effective Date forward, interest will accrue at the Confirmation Rate. Interest will accrue and principal and interest paid as set forth herein based on a thirty (30) year amortization with a final maturity of sixty (60) months from the Effective Date. All payment made during the Chapter 11 shall reduce, dollar for dollar, the principal amount of the Class 1 Claim.

The Reorganized Debtor shall remain current on all taxes, subject to challenges by the Debtor for market conditions and taxing authority's property valuation. The

Reorganized Debtor shall remain current on all appropriate insurance policies to extent obligated, list DIP Lender as a loss payee, and provide proof of the same to DIP Lender.

The DIP Lender Note will have standard and commercially reasonable default provisions, and DIP Lender will provide the Reorganized Debtor ten (10) days notice of any default with a right to cure. If said Default is not remedied within said 10-day period, the new note will provide for customary remedies. A copy of proposed loan documents will be available for inspection at least ten (10) days prior to the Confirmation Hearing.

> b. <u>Class 2 – Centennial Bank, f/k/a Old Southern Bank</u>.

Class 2 consists of the Allowed Secured Claim of Centennial. The Claim is secured by liens on all real and personal property of Sherwood Farms (collectively, the "Centennial Bank Property"). Centennial shall retain its lien and mortgage on, among other things, Sherwood Farms real property, buildings, fixtures and personal property, and leases and rents.

In full satisfaction of its Allowed Class 2 Claim, Centennial shall have a lien as stated above and receive a new secured note ("the Centennial Bank Note") in the amount of the Allowed Secured Claim. The new note shall be paid through the proceeds of core operations. A copy of the proposed new note and mortgages shall be available at least ten (10) days prior to the Confirmation Hearing and will be provided to any party who requests such.

The Centennial Bank Note shall be in the amount of its Allowed Secured Claim, which claim shall not exceed the combined market value of the Centennial Bank Property. From Effective Date forward, interest will accrue at the Confirmation Rate. Interest will accrue and principal and interest paid as set forth herein based on a thirty (30) year amortization with

a final maturity of sixty (60) months from the Effective Date. Any payment made during the Chapter 11 shall reduce, dollar for dollar, the principal amount of the Class 2 Claim.

Centennial Bank shall receive a Class 7 Allowed Unsecured Claim for the difference, if any, between the Centennial Bank Note and its claim as originally filed.

The Reorganized Debtor shall remain current on all taxes, subject to challenges by the Debtor for market conditions and taxing authority's property valuation. The Reorganized Debtor shall remain current on all appropriate insurance policies to extent obligated, list Centennial as a loss payee, and provide proof of the same to Centennial.

The Centennial Bank Note will have standard and commercially reasonable default provisions, and Centennial will provide the Reorganized Debtor ten (10) days notice of any default with a right to cure. If said Default is not remedied within said 10 day period, the new note will provide for customary remedies. A copy of proposed loan documents will be available for inspection at least ten (10) days prior to the Confirmation Hearing.

c.    <u>Class 3 – Pentagon Apollo, Ltd. – Sherwood Farms</u>

Class 3 consists of the Allowed Secured Claim of Pentagon Apollo, Ltd. in respect of its prepetition loan to Sherwood Farms. The Class 3 Claim is secured by a second mortgage on Sherwood Farm's real property. Because the Class 3 Claim is fully subordinate to Centennial, the entire Class 3 Claim, pursuant to Bankruptcy Code § 506, is Unsecured. Accordingly, Pentagon Apollo, shall receive a Claim in Class 7 in an amount equal to the Allowed amount of its Class 3 Claim.

d.    <u>Class 4 – Pentagon Apollo – Sherwood Investments</u>.

Class 4 consists of the Allowed Secured Claim of Pentagon Apollo, Ltd. in respect of its prepetition loan to Sherwood Investments. The Class 4 Claim is secured by a lien on all assets of Sherwood Investments. The Class 4 Claim shall also include the DIP Loan to Sherwood Investments.

In full satisfaction of its Allowed Class 4 Claim, Pentagon Apollo shall have a first priority lien on the Net Adversary Proceeds and shall be entitled to payment prior to any distribution to Class 7.

e.    <u>Class 5 – Sherwood Investments</u>.

Class 5 consists of Allowed Secured Claim of Sherwood Investments in respect of its loan to Sherwood Farms. Because Sherwood Investments' position is fully subordinate to Centennial, the entire Class 5 Claim, via Bankruptcy Code § 506, is Unsecured. Accordingly, Sherwood Investments shall receive a Claim in Class 7 in an amount equal to the Allowed amount of its Class 5 Claim.

f.    <u>Class 6 – Lake County Tax Collector</u>.

Class 6 consists of the Allowed Secured Claims of the Lake County Tax Collector ("Tax Collector"), which are secured by a first priority tax lien on Sherwood Farms' real property.

In full satisfaction of its Allowed Secured Claims, the Tax Collector shall retain its Liens against the applicable Real Property and receive monthly payments based on a thirty (30) year amortization and a five (5) year maturity with interest at the Statutory Rate.

Payments will commence on the First Business Day of the First Calendar month after the Effective Date and continue each month thereafter.

3.    <u>Unsecured Claims</u>.

<u>Class 7 – Allowed Unsecured Claims</u>.

Class 7 consists of all Allowed Unsecured Claims of both of the Debtors including asserted Secured Claims which, by virtue of Bankruptcy Code § 506, will be entirely Unsecured. In full satisfaction of the Allowed Class 7 Claims, holders of such claims shall receive their *pro rata* share of the Net Adversary Proceeds after payment in full to Class 4. Should judgment of the ABN Adversary be granted in favor of the Debtors, or Reorganized Debtors or any of them, or should the parties to the ABN Adversary effect a compromise and settlement such that an award is made in favor of the Debtors, or Reorganized Debtors or any of them (the "Adversary Proceeds"), then the Net Adversary Proceeds shall be distributed by the Reorganized Debtors to holders of Allowed Class 7 Claims on a pro rata basis.

4.    <u>Equity Interests</u>.

a.    <u>Class 8 – Equity Interests of Sherwood Farms, Inc.</u>

Class 8 consists of any and all membership interests, common stock, stock options, and warrants currently issued or authorized in Sherwood Farms. All currently issued and outstanding Equity Interests in Sherwood Farms shall be retained by their respective holders.

   b.  <u>Class 9 – Equity Interests of Sherwood Investments Overseas, Ltd.</u>

    Class 9 consists of any and all membership interests, common stock, stock options, and warrants currently issued or authorized by Sherwood Investments. All currently issued and outstanding Equity Interests in Sherwood Investments shall be retained by their respective holders.

  C.  <u>Means of Implementation</u>.

    1.  <u>Business Operations and Cash flow</u>.

    The Plan contemplates that the Reorganized Debtors will continue to operate their respective reorganized businesses, with low operating expenses. The Plan contemplates that the Reorganized Debtors shall execute new notes, mortgages, and security agreements with Centennial. The Debtors believe the cash flow generated from core operating, along with a reduction in cash flow demands from the New Secured Obligations will be sufficient to meet operating needs and required Plan Payments.

    2.  <u>Funds Generated During Chapter 11</u>.

    All cash in excess of operating expenses generated from operations until the Effective Date will be used for Plan Payments.

    3.  <u>Reorganized Debtors</u>.

    After Confirmation, the common stock of the Equity Holders shall remain in full force and effect as set forth herein. The current officers and directors shall remain in respect of the Reorganized Debtors.

4. <u>Management and Control of Sherwood Farms</u>.

    (i).   <u>Directors</u>.

        The operations of Sherwood Farms shall be overseen by its Board of Directors. The Board of Directors shall have the power to request and obtain all financial data and operation information regarding the Reorganized Debtor at any time. The Board of Directors shall have all corporate authority vested in boards of directors under the applicable laws of the State of Florida including the power to appoint and terminate officers and to liquidate the Reorganized Debtor and to wind up its affairs, with all such powers to be exercised by a majority vote.

        Julian Benscher shall serve as Chairman of the Board. The initial Directors shall continue to serve until either (i) Reorganized Debtor cease to do business, or (ii) a Director resigns or is replaced by the shareholders in accordance with Florida law. The Directors shall be entitled to receive reasonable compensation.

    (ii).   <u>Officers</u>.

        No officer of any Reorganized Debtor shall have the authority to sell substantially all of the assets of Reorganized Debtor or to liquidate Reorganized Debtor unless a majority of the Directors of any Reorganized Debtor approves such actions. Should a majority of the Directors of such Reorganized Debtor instruct the officers of any Reorganized Debtor to take such actions, the officers of Reorganized Debtor shall follow such instructions to the best of their abilities.

        Julian Benscher shall be the initial Chief Executive Officer and President of Sherwood Farms. After discussions with several of the Debtors secured creditors, it is Sherwood Farms' belief that the continued involvement of the officers is a condition precedent to the

concessions received herein from the secured creditors and lenders and is crucial to Reorganized Debtors' go-forward success.

The President shall have authority to conduct the operations of Reorganized Debtor and shall delegate such authority to other officers as the applicable Board of Directors may direct. The President, and other officers of the Reorganized Debtor shall have the powers, duties, and responsibilities typically held by such officers in companies similar to the applicable Reorganized Debtor and, in addition, shall be responsible for promptly providing any Director with all information regarding the applicable Reorganized Debtor which such Director may request. The officers of each Reorganized Debtor shall be entitled to reasonable compensation as determined by respective management contracts, and, if not contract exists, as fixed by the Board of Directors

5. <u>Disbursements</u>.

All Disbursements made pursuant to this Plan shall be paid by the Reorganized Debtors from cash flow generated by core operations.

D. <u>Other Provisions</u>.

1. <u>Leases and Executory Contracts</u>.

The Plan provides that the Debtors shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not rejected by such date, then such unexpired lease or executory contract shall be deemed rejected. It is the position of the Debtors that the executory contracts listed in the respective Schedules of Executory Contracts filed pursuant to Rule 1007, are the only executory contracts to which any of the Debtors

was a party on the Petition Date. The Plan also provides for the Bankruptcy Court to retain jurisdiction as to certain matters as stated in the Plan, including, without limitation, prosecution of all Causes of Action and objections to Claims.

To the extent any executory contract or lease is rejected by operation of this provision, any party asserting a Claim, pursuant to Sections 365 and 502(g) of the Code, arising from such rejection shall file a proof of such Claim within thirty (30) days after the entry of an Order Confirming the Plan, and any Allowed Claim resulting from such rejection shall be a Class 7 Claim except as otherwise provided herein.

2. Procedures For Resolving Disputed Claims.

a. Prosecution of Objections to Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as otherwise provided in the Plan, the Debtors or Reorganized Debtors, as applicable, shall have the exclusive right to make and file objections to all Claims. All objections commenced prior to Confirmation Date shall be finished by the Reorganized Debtors.

Pursuant to the Plan, unless another time is set by order of the Bankruptcy Court, all objections to Claims and Equity Interests shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims and Equity Interests to which objections are made within 90 days after the Confirmation Date.

Except as may be specifically set forth in the Plan, nothing in the Plan, the Disclosure Statement, the Confirmation Order or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any claim, cause of action, right of

setoff, or other legal or equitable defense that, any Debtor had immediately prior to the commencement of the Chapter 11 Cases, against or with respect to any Claim or Equity Interest. Except as set forth in the Plan, upon Confirmation, the Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that any Debtor had immediately prior to the commencement of the Chapter 11 Cases as if the Chapter 11 Cases had not been commenced.

        b.    <u>Estimation of Claims</u>.

Pursuant to the Plan, the Debtors may, at any time, request that the Bankruptcy Court estimate any contingent, disputed or unliquidated Claim pursuant to Section 502(c) of the Code regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, disputed or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

        c.    <u>Cumulative Remedies</u>.

In accordance with the Plan, all of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not necessarily exclusive of

one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Until such time as an Administrative Claim, Claim or Equity Interest becomes an Allowed Claim, such Claim shall be treated as a Disputed Administrative Claim, Disputed Claim or Disputed Equity Interest for purposes related to allocations, Distributions, and voting under the Plan.

        d.      <u>Payments and Distributions on Disputed Claims</u>.

As and when authorized by a Final Order, Disputed Claims that become Allowed Claims shall be paid by the Reorganized Debtors, such that the Holder of such Allowed Claim receives all payments and Distributions to which such Holder is entitled under the Plan in order to bring payments to the affected Claimants current with the other participants in the particular Class in questions. Except as otherwise provided in the Plan, no partial payments and no partial Distributions will be made with respect to a Disputed Claim until the resolution of such disputes by settlement or Final Order. Unless otherwise agreed by the Reorganized Debtors or as otherwise specifically provided in the Plan, a Creditor who holds both an Allowed Claim and a Disputed Claim will not receive a Distribution until such dispute is resolved by settlement or Final Order.

        e.      <u>Allowance of Claims and Interests</u>.

        (i).      <u>Disallowance of Claims</u>.

According to the Plan, all Claims held by Entities against whom any Debtor has obtained a Final Order establishing liability for a cause of action under Sections 542, 543, 522(f), 522(h), 544, 545, 547, 548, 549, or 550 of the Code ("Causes of Action")

shall be deemed disallowed pursuant to Section 502(d) of the Code, and Holders of such Claims may not vote to accept or reject the Plan, both consequences to be in effect until such time as such causes of action against that Entity have been settled or resolved by a Final Order and all sums due the related Debtor by that Entity are turned over to such Debtor. Debtors reserve and shall have the exclusive right and authority to bring any Causes of Action.

(ii).    Allowance of Claims.

Except as expressly provided in the Plan, no Claim or Equity Interest shall be deemed Allowed by virtue of the Plan, Confirmation, or any Order of the Bankruptcy Court in the Chapter 11 Cases, unless and until such Claim or Equity Interest is deemed Allowed under the Code or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim or Equity Interest.

f.    Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Equity Interests or any Class of Claims or Equity Interests are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before the Confirmation Date. If such controversy is not resolved prior to the Effective Date, the Debtors' interpretation of the Plan shall govern.

3.    Effect of Confirmation.

a.    Authority to Effectuate the Plan.

Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides all matters provided under the Plan will be deemed to be authorized and approved

without further approval from the Bankruptcy Court. The Confirmation Order will act as an order modifying the respective Debtors' by-laws such that the provisions of this Plan can be effectuated. The Reorganized Debtors shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve Consummation and carry out the Plan.

b. <u>Post-Confirmation Status Report</u>. Pursuant to the Plan, within 120 days of the entry of the Confirmation Order, the Debtors will file status reports with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan. The status report will be served on the United States Trustee, and those parties who have requested special notice post-confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## IV. **<u>CONFIRMATION</u>**

A. <u>Confirmation Hearing</u>.

Section 1128 of the Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement to be made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to Confirmation Hearing:

Counsel for the Debtors:

R. Scott Shuker, Esquire
Latham, Shuker, Eden & Beaudine, LLP
390 N. Orange Avenue, Suite 600
Orlando, Florida 32801

and

Frank M. Wolff, Esquire
Wolff, Hill, McFarlin & Herron, P.A.
1851 West Colonial Drive
Orlando, FL 32804

Debtors:

Sherwood Farms, Inc.
c/o Julian Benscher
13613 Honeycomb Rd.
Groveland, FL 34736

and

Sherwood Investments Overseas, Ltd., Inc.
c/o Julian Benscher
5165 Isleworth Country Club Rd.
Windermere, FL 34786

United States Trustee:

135 West Central Blvd.
Suite 620
Orlando, Florida 32801

B.      Financial Information Relevant to Confirmation.

As of the original filing of the Disclosure Statement, Debtors had not yet completed

the financial projections and liquidation analysis. Such documents will be filed prior to the

Disclosure Statement hearing and included in the Solicitation package. Attached as Exhibits to the Disclosure Statement to be served upon Creditors and incorporated herein, are the following:

(i) **Exhibit "A"** is a copy of the Debtors' financial projections for the first three years of Plan Payments. The projections indicate that the Reorganized Debtors' operational cash flow will be sufficient to service the required Plan Payments at a debt level as described herein using an anticipated Effective Date of November 30, 2010. The projections and other financial information has been provided by and prepared by the Debtors' management. The projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. These projections are based upon a variety of estimates and assumptions which may not be realized. The projections are based on assumptions existing as of August 1, 2010 and have not materially changed.

(ii) **Exhibit "B"** is a copy of Debtors' Chapter 7 liquidation analysis ("Liquidation Analysis") establishing that Creditors of Debtors will fair materially poorer in the event the Debtors are forced into Chapter 7 as compared to the Plan.

C.    <u>Confirmation Standards</u>.

For a plan of reorganization to be confirmed, the Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the Code. Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept the plan, that confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the requirements enumerated in Section 1129 of the Code have been met. Debtors believe that the Plan satisfies all of the requirements for Confirmation.

1. Best Interests Test.

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Interest of such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if Debtors were, on the Effective Date, liquidated under Chapter 7 of the Code. Debtors believe that satisfaction of this test is established by the Liquidation Analysis.

To determine what holders of Claims and Equity Interests would receive if Debtors were liquidated, the Bankruptcy Court must determine how the assets and properties of Debtors would be liquidated and distributed in the context of a Chapter 7 liquidation case.

Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee and any unpaid expenses incurred by Debtors during the Chapter 11 Cases, including compensation of attorneys and accountants. The additional costs and expenses incurred by a trustee in a Chapter 7 liquidation could be substantial and would decrease the possibility that Unsecured Creditors and holders of Equity Interests would receive meaningful distributions. The foregoing types of Claims arising from Chapter 7 administration and such other Claims as may arise in

Chapter 7 or result from the pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors. Liquidation in Chapter 7 might substantially delay the date at which Creditors would receive any Payment.

Debtors have carefully considered the probable effects of liquidation under Chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Equity Interests, including the following:

a.     the possible costs and expenses of the Chapter 7 trustee or trustees;

b.     the possible adverse effect on recoveries by Creditors under Chapter 7 due to reduced sale prices for Debtors' assets caused by the forced Chapter 7 liquidation; and

c.     the possible substantial increase in Claims, which would rank prior to or on a parity with those of Unsecured Creditors.

2.     <u>Financial Feasibility</u>.

The Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Debtors unless the liquidation is proposed in the Plan. As reflected in **Exhibit "A",** Debtors believe that core operations of Reorganized Debtors will generate sufficient cash flow to make all Plan Payments as noted herein. Based upon the financial projections, Debtors assert that the Plan is feasible and Confirmation is not likely to be followed by further financial reorganization.

3. <u>Acceptance by Impaired Classes</u>.

The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless (i) the legal, equitable and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the holder is entitled.

4.     <u>Confirmation Without Acceptance by all Impaired Classes; "Cramdown."</u>

The Code contains provisions that enable the Bankruptcy Court to confirm the Plan, even though the Plan has not been accepted by all Impaired Classes, provided that the Plan has been accepted by at least one Impaired Class of Claims. Section 1129(b)(1) of the Code states:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly, and it is fair and equitable with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan.

**DEBTORS BELIEVE THAT, IF NECESSARY, THEY WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE CODE WITH RESPECT TO THE NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

D.     <u>Consummation</u>.

The Plan will be consummated and Payments made if the Plan is Confirmed pursuant to a Final Order of the Bankruptcy Court, the Effective Date occurs, and the Debtors, the Reorganized Debtors and applicable parties reach agreement on any required documents. It will not be necessary for the Reorganized Debtors to await any required regulatory approvals from agencies

or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Code.

E. <u>Exculpation from Liability</u>.

The Debtors, the Reorganized Debtors, their respective members, Managers, Officers and directors, and their respective Professionals (acting in such capacity) shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the plan or the Reorganization Case; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to the Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Reorganization Case. The rights granted hereby are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtors, the Reorganized Debtors, and their respective agents have or obtain pursuant to any provision of the Code or other applicable law, or any agreement. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions hereof shall not release or be deemed a release of any of the Causes of Action

otherwise preserved by the Plan. The terms of this exculpation shall only apply to liability arising from actions taken on or prior to the Effective Date.

**ANY BALLOT VOTED IN FAVOR OF THE PLAN SHALL ACT AS CONSENT BY THE CREDITOR CASTING SUCH BALLOT TO THIS EXCULPATION FROM LIABILITY PROVISION. MOREOVER, ANY CREDITOR WHO DOES NOT VOTE IN FAVOR OF THE PLAN MUST FILE A CIVIL ACTION IN THE BANKRUPTCY COURT ASSERTING ANY SUCH LIABILITY WITHIN THIRTY (30) DAYS FOLLOWING THE EFFECTIVE DATE OR SUCH CLAIMS SHALL BE FOREVER BARRED.**

Notwithstanding the foregoing, (i) the Reorganized Debtors shall remain obligated to make payments to Holders of Allowed Claims as required pursuant to the Plan and (ii) the Debtors' respective members, Managers or executive officers shall not be relieved or released from any personal contractual liability except as otherwise provided in the Plan.

F.    Police Power.

Nothing in this Article IV shall be deemed to effect, impair, or restrict any federal or state governmental unit from pursuing its police or regulatory enforcement action against any person or entity, other than to recover monetary claims against the Debtors for any act, omission, or event occurring prior to Confirmation Date to the extent such monetary claims are discharged pursuant to Section 1141 of the Code.

G.    Revocation and Withdrawal of this Plan.

The Debtors reserve the right to withdraw this Plan at any time before entry of the Confirmation Order. If (i) the Debtors revoke and withdraw this Plan, (ii) the Confirmation Order is not entered, (iii) the Effective Date does not occur, (iv) this Plan is not substantially

consummated, or (v) the Confirmation Order is reversed or revoked, then this Plan shall be deemed null and void.

H.   Modification of Plan.

The Debtors may seek to amend or modify this Plan in accordance with Section 1127(b) of the Code, remedy any defect or omission, or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

On or before substantial consummation of the Plan, the Debtors, may issue, execute, deliver or file with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

V.   **ALTERNATIVE TO THE PLAN.**

If the Plan is not confirmed and consummated, Debtors believe that the most likely alternative is a sale of the Debtors or a liquidation of the Debtors under Chapter 7 or 11 of the Code. In a liquidation or sale, Debtors believe the deficiency claims from the secured lenders could be as much as $10,000,000, and, as such, the pool of Allowed Unsecured (Class 7) Claims would be increased and the dividend to such group greatly diminished. Debtors believe that liquidation of all real and personal property in a Chapter 7 scenario would dramatically reduce the total amount available to Creditors. In a case under Chapter 7 of the Code, a trustee would be elected or appointed to liquidate the assets of Debtors for distribution to Creditors in accordance with the priorities established by the Code. Debtors' analysis of the probable recovery to Creditors and holders of Equity Interest is set forth in the Liquidation Analysis.

## VI.    CONCLUSION.

Debtors recommend that holders of Claims and Interests vote to accept the Plan.

**DATED** this 23rd day of July 2010 in Orlando, Florida.

/s/ R. Scott Shuker
R. Scott Shuker
Florida Bar No: 984469
rshuker@lseblaw.com
Victoria Kothari
Florida Bar No. 0730831
vkothari@lseblaw.com
**LATHAM, SHUKER, EDEN & BEAUDINE, LLP**
390 N. Orange Avenue, Suite 600
Orlando, Florida 32801
Tel: 407-481-5800
Fax: 407-481-5801
*Attorneys for Debtor*