# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                              CHAPTER 11

**SHERWOOD FARMS, INC.**                   CASE NO.  6:10-bk-00578-KSJ

                    Debtor.
_____ /

## SECOND AMENDED DISCLOSURE STATEMENT
## <u>SUBMITTED BY DEBTOR SHERWOOD FARMS, INC.</u>

COUNSEL FOR DEBTOR AND DEBTOR-IN-POSSESSION

R. SCOTT SHUKER, ESQ.
VICTORIA KOTHARI, ESQ.
LATHAM, SHUKER, EDEN & BEAUDINE, LLP
390 N. ORANGE AVENUE, SUITE 600
ORLANDO, FLORIDA, 32801

December 17, 2010

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                              CHAPTER 11

SHERWOOD FARMS, INC.                                CASE NO.  6:10-bk-00578-KSJ

                    Debtor.
_____ /

SECOND AMENDED DISCLOSURE STATEMENT
SUBMITTED BY DEBTOR SHERWOOD FARMS, INC.

I.    INTRODUCTION AND SUMMARY

       This Second Amended Disclosure Statement ("Disclosure Statement") is filed pursuant to the

requirements of §1125 of Title 11 of the United States Code (the "Code").  This Disclosure

Statement is intended to provide adequate information to enable holders of claims in the above-

captioned bankruptcy case ("Bankruptcy Case") to make informed judgments about the Plan of

Liquidation (the "Plan") submitted by Sherwood Farms, Inc. ("Sherwood Farms" or "Debtor").  The

Debtor is soliciting votes to accept the Plan.  The overall purpose of the Plan is to provide for orderly

liquidation of Debtor's assets in a manner designed to maximize recoveries to all stakeholders.  The

Debtor believes that the Plan provides the best means currently available for their emergence from

Chapter 11 and the best recoveries possible for holders of claims and interests against the Debtor,

and thus strongly recommends that you vote to accept the Plan.

       **THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE
       THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT
       TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES
       TO ACCEPT THE PLAN.  THIS INTRODUCTION AND SUMMARY IS
       QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF
       THIS   DISCLOSURE   STATEMENT,   AND   THIS   DISCLOSURE
       STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN.
       THE  PLAN  IS  AN  INTEGRAL  PART  OF  THIS  DISCLOSURE
       STATEMENT, AND ANY HOLDER OF ANY CLAIM OR INTEREST**

SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTOR IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE WHICH ARE OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTOR'S BUSINESS AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE DEBTOR'S CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

Sherwood Farms, and its parent company, Sherwood Investments Overseas Limited, Incorporated ("SIO") are debtors under Chapter 11 of the Code in bankruptcy cases pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court").

As prescribed by the Code and the Rules, Claims asserted against, and Equity Interests in, the Debtor are placed into "Classes". The Plan designates seven (7) separate classes of Claims and Interests. The Plan contemplates paying these classes of Claims from: (a) the liquidation of assets; and (b) proceeds of the Adversary Proceeding. The Plan provides that the Debtor's ownership interests will remain Unimpaired.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtor is altered, modified or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired", and the holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan ("Ballot") will be mailed along with the order approving this Disclosure Statement.

**THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE <u>RECEIVED</u> AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

| <u>VOTING DEADLINE</u> |
| --- |
| The last day to vote to accept or reject the Plan is _____, 2011. All votes must be received by the voting agent by 5:00 p.m. (EST) on that day. |

Upon receipt, the Ballots will be tabulated, and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail in Section IV of this

Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court will schedule a hearing (the "Confirmation Hearing") to consider whether the Debtors have complied with those requirements.

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called "cramdown." As described in greater detail in Section IV of this Disclosure Statement, Debtor has expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

## II.   DESCRIPTION OF DEBTOR'S AND SIO'S BUSINESSES

### A.   Commencement of the Cases

On January 15, 2010 ("Petition Date"), Sherwood Farms and SIO filed voluntary petitions for reorganization under Chapter 11 of the Code in the United States Bankruptcy Court for the Middle District of Florida. No trustee has been appointed in either of the Bankruptcy Cases. The Debtors continue to operate their respective businesses as a debtor-in-possession under Sections 1101 and 1108 of the Code (Case No. 6:10-bk-00578, Doc. No.1 & Case No. 6:10-bk-00584, Doc. No.1, respectively).

### B.   General Background.

SIO is a British Virgin Islands corporation in the business of managing investments for at least 14 years and, in recent times, has specialized in United States public companies with a value of less than $500 million. SIO is an entity wholly-owned by the Johanna Benscher Family Settlement, a trust formed in Liberia. SIO carries on the business of investing and dealing in shares on its own account and also managing shareholding portfolios on behalf of others. It has managed money for

third parties, advised on the creation of derivative products, and managed its own funds. SIO was registered with the State of Florida in 2004 as a foreign profit corporation.

In 2001 and 2002, SIO provided substantial loans (the "SIO Loans") to Sherwood Farms' predecessor company, American Mercantile Corporation ("AMC") and certain related and affiliated parties"[1]. In conjunction with SIO Loans, SIO secured its financial risk through various means including, in relevant part, by the execution of the Pledge Agreement.

Ultimately, AMC and its Affiliates defaulted on SIO Loans and SIO exercised its right, pursuant to the Pledge Agreement, to obtain the pledged shares. As a result of the default, SIO acquired management and voting control of AMC, Pacific and Select. Shortly after acquiring control of AMC, Pacific and Select, SIO learned that the financial straits of each entity necessitated reorganization under Chapter 11 (the "2004 Bankruptcy").[2]

C.    Sherwood Farms' Business

After the 2004 Bankruptcy, AMC changed its name to Sherwood Farms but continued AMC's business, namely, the cultivation and sale of orchids to wholesalers and flea markets. Over the years, Sherwood Farms developed both significant orchid growing expertise, and as a consequence, a valued customer list. Sherwood Farms specializes in growing the "Dendrobium" variety of orchids and is one of the largest growers of this variety in the U.S.

---

1      Between April 2001 and July 2002, SIO made various loans totaling in excess of $10 million dollars to Yasuhiko Tominaga ("Tominaga"), the previous owner, director and president of Japan Pacific Trading Corp. ("Pacific"); Florida Select Citrus, Inc. ("Select") (Tominaga, Pacific and Select, collectively, the "Affiliates") and AMC. In connection with the loans, Tominaga, Pacific, Select and AMC executed various loan and security documents in favor of SIO (the "Loan Documents"). The Loan Documents included an Amended and Consolidated Stock Pledge and Escrow Agreement (the "Pledge Agreement").
2 On October 7, 2004, Japan Pacific Trading Corporation, (Case No. 6-04-bk-11049), Florida Select Citrus Inc. (Case No. 6-04-bk-11050); and American Mercantile Corporation (Case No. 6-04-bk-11052) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida.

Sherwood Farms' corporate offices, greenhouses and warehouse sit upon 238 acres of land in Groveland, Florida (the "Property"). The Property consists of approximately 150 acres of usable land and features 16 acres of greenhouses. The land also includes a small office facility along with some warehouse storage area. Within the greenhouses, Sherwood Farms has approximately 800,000 orchids. SIO, as the parent company, has historically supplied Sherwood Farms with necessary operating capital.

As of the Petition Date, Centennial Bank ("Centennial") f/k/a Old Southern Bank claimed a first priority[3] security interest in the assets of Sherwood Farms. The face amount of the obligation is approximately $5,450,000.00. Pentagon Apollo, Ltd. ("Pentagon Apollo") claimed a second priority security interest in the Property and other assets of Sherwood Farms and is owed approximately $4,050,000.00. Finally, SIO has a third priority security interest in the Property and is owed approximately $4,800,000.00.

Neither of the security interests held by Centennial and Pentagon have been foreclosed, although the payments to both mortgage holders are in default. As of the Petition Date, Sherwood Farms also has several unsecured priority claims consisting largely of approximately $45,000.00 in tax obligations, a related party loan in the approximate amount of $1,070,000.00, and an additional $275,000.00 in unsecured non-priority claims owed to other trade creditors.

D.    SIO's Business

In late April 2006, SIO, upon the advice and at the direction of Julian Benscher ("Benscher"), established a commercial relationship with ABN AMRO Bank N.V. ("ABN"), a bank incorporated

---

3  As discussed later in the Disclosure Statement, Pentagon Apollo provided post-petition debtor-in-possession financing (the "DIP Loan") to Sherwood Farms. Pentagon Apollo was granted a priming lien with respect to the DIP Loan, Centennial and Pentagon Apollo's relative positions were moved to second and third positions, respectively.

in the Netherlands, with a branch in London, England. Although the parties never signed a master agreement to govern their relationship, they engaged in a consistent course of conduct, from April 2006 through September 2008, that effectuated and carried out the trading relationship pursuant to the parties' intentions.

SIO managed certain capital on behalf of Pentagon Capital Management PLC ("Pentagon Capital"), an FSA regulated investment manager incorporated in England and Wales (the "PC Investments"). The PC Investments took the form of both equity and debt funding.

As of the Petition Date, Pentagon Apollo has a secured claim in SIO for approximately $5,850,000.00[4]. The loans upon which this claim is based are currently in default. SIO also has several unsecured claims totaling approximately $6,600,000.00. SIO is uncertain as to the market value of its assets. But for the actions of ABN, the underlying securities held by SIO would have been of significant value. The actions of ABN caused the securities held by SIO to become worthless and forced the liquidation by UBS of other derivative positions that relied to varying extents on the value of the ABN-held securities. SIO is in the process of determining the extent of its losses.

E.    Significant Developments and Events Leading to Chapter 11 Filing.

Beginning in early to mid-September 2008, financial markets experienced tremendous instability and events unfolded that no one could have predicted or foreseen just the month before. On September 15, 2008, Lehman Brothers, one of the world's largest investment banking firms, filed for bankruptcy and it closed its doors shortly thereafter. This was the largest bankruptcy in U.S.

---

4 Approximately, $4,050,000.00 of this amount is based upon a guaranty of Sherwood Farms indebtedness to Pentagon Apollo.

history. On September 16, 2008, the Federal Reserve Bank gave an $85 billion credit facility to American International Group (AIG) in order to prevent AIG's collapse. This was the largest government bailout of a private company in U.S. history. Stock markets around the world were in turmoil. The New York Stock Exchange suffered one-day losses that had not been seen since 9/11. Following Lehman's collapse, the last two major U.S. investment banks, Morgan Stanley and Goldman Sachs, appeared vulnerable and took radical steps (including converting from investment banks to bank holding companies regulated by the Federal Reserve) in order to avert their own demise.

The Royal Bank of Scotland Group ("ABN")[5] also faced severe financial problems, in part due to massive costs and liabilities associated with its purchase of ABN in October 2007. Ultimately, beginning in October 2008, the British Government infused tens of billions of dollars of new capital into ABN, in return for what is today a 70% public ownership interest.

The unprecedented financial crisis facing banks like ABN in September 2008 in no way excuses ABN for the actions that it took during the last two weeks of that month which destroyed its trading relationship with SIO and caused tens of millions of dollars in damages to SIO. Rather, the crisis that threatened the stability (and survival) of financial institutions worldwide provides a larger context for the reckless and wrongful conduct by ABN that is described below.

In a matter of days, ABN closed all of SIO's trading positions and appropriated all remaining SIO cash, despite SIO's timely infusions of additional payments that ABN "purportedly agreed to accept" to settle "live" and "open" trades. In addition to keeping all of the sales proceeds, by

---

5 ABN AMRO Bank was subsequently acquired by the Royal Scotland Bank, Santander, and the Dutch government. However, to avoid confusion, thoughout this Disclosure Statement the entity will be referred to as "ABN."

liquidating all of SIO's trading positions in this manner, ABN triggered even greater falls in the respective stocks' prices. In just a matter of days, **eighteen million dollars** of SIO capital with ABN had been reduced to **zero**.

Moreover, due to ABN's actions, SIO suffered consequential damages with respect to obligations owed by SIO to UBS and to Pentagon Capital pursuant to the terms of their respective business relationships. In fact, SIO's banking relationship with UBS was effectively destroyed, causing further losses to SIO.

The ripple effects of ABN's actions also significantly impaired SIO's ability to support Sherwood Farms and ultimately, caused SIO such a massive financial hardship that SIO and Sherwood Farms, its wholly-owned subsidiary, were forced into bankruptcy. Specifically, the actions of ABN caused the immediate withdrawal of third-party funds being managed by SIO and the inability of SIO to support its wholly-owned U.S. subsidiary, Sherwood Farms. In addition, the general deterioration in the U.S. economy has caused a decline in overall consumer spending and, thus, a reduction in sales for the Sherwood Farms. Furthermore, due to a period of abnormally cold weather, Sherwood Farms' sales came to a virtual halt, while heating costs soared from an average of $16,000.00 monthly to $16,000.00 weekly, in the weeks prior to filing these Bankruptcy Cases.

In consideration of the issues described above, the Debtors decided that reorganizing under Chapter 11 was in the best interest of all parties. Consequently, on October 13, 2009, ("Petition Date") the Debtors filed voluntary petitions for relief under Chapter 11 of the Code in the Middle District of Florida. The breaches by ABN described above will be addressed through the Adversary Proceeding.

F.    Events Subsequent to Chapter 11 Filing

Since the Petition Date, the Debtors have continued to operate their businesses as debtors-in-possession under Section 1107(a) and 1108 of the Code. The Debtors sought and obtained an order, pursuant to Section 327 of the Code, from the Bankruptcy Court authorizing the Debtors to retain Latham, Shuker, Eden & Beaudine, LLP as Debtors' counsel (Sherwood Farms, Doc No. 43), and as Debtors' Special Litigation Counsel in SIO (SIO, Doc. No.41).

On January 19, 2010, the Debtors filed Emergency Motions for a Debtor-in-Possession Loan (Sherwood Farms, Doc. No. 12 and SIO, Doc. No. 10). On February 17, 2010, the Court entered its final orders approving the Pentagon Apollo ("DIP Lender") Debtor-in-Possession Loan in the amount of $350,000.00 ("DIP Loan") and providing liens, security interests and super-priority claims to the DIP Lender (Sherwood Farms, Doc. No. 39 and SIO, Doc. No. 37).

On February 12, 2010, SIO filed an Application to Employ Frank M. Wolff and Wolff, Hill, McFarlin & Herron as Debtor's Counsel (SIO, Doc. No. 32). On February 23, 2010, the Court entered an Order approving the employment of Wolff, Hill, McFarlin & Herron (SIO, Doc. No. 40).

On April 1, 2010, Sherwood Farms filed an Application to Employ Richard Pilhorn and Osburn Henning & Co. as Accountants (Sherwood Farms, Doc. No. 46) which was approved by the Court and an order was entered on April 15, 2010 (Doc. No. 49).

On June 4, 2010, SIO filed the Adversary Proceeding (the "ABN Adversary"). On August 3, 2010, ABN filed the following motions: (i) Motion for Jury Trial (ABN Adversary, Doc. No.13); (ii) Motion to Dismiss Case for Forum Non Conveniens (ABN Adversary, Doc. No.14); (iii)

Motion for Withdrawal of the Reference of Adversary Proceeding (the "Withdrawal Action")(ABN Adversary, Doc. No.15); and (iv) Motion for Determination that Counts I Through XI of Complaint are Non-Core (ABN Adversary, Doc. No.16). On October 18, 2010, Judge Conway entered an Order denying ABN's Motion for Withdrawal of Reference of Adversary Proceeding without prejudice (M.D.10-1332, Doc. No. 10). Thereafter, on December 9, 2010 Judge Jennemann entered an order Denying the Motion to Dismiss.

Despite several attempts to find a viable means to reorganize as an operating entity, Debtor has been unable to formulate a feasible plan for operations. Accordingly, Debtor determined the means to achieve the highest return for creditors was a sale of all assets through the use of a third-party broker (the "Sale"). Debtor will file a motion to approve procedures for the Sale ("Sale Procedures") by year end. However, it is expected that the Sale Procedures will include the following: (a) a thirty (30) day marketing period; (b) submission of offer letters at the conclusion of such; (c) a requirement that offer letters contain no due diligence, a five percent (5%) deposit, and demonstrate financial wherewithal to close; and (d) an in-person auction for all parties who submit qualified offers. The Sale will be approved simultaneously with Confirmation.

III.  **THE PLAN**

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF DEBTOR'S PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

A.     Overview.

In summary, Sherwood Farms will liquidate its assets through the Sale. The proceeds from the Sale will be distributed to Holders of Allowed Secured Claims consistent with the relative lien priorities. Any Holder of an Allowed Secured Claim who is not paid in full from the Sale will hold an Allowed Class Six (6) Claim for any unpaid amounts.

All Claims against the Debtor shall be classified and treated pursuant to the terms of the Plan. As noted more fully below, the Plan contains seven (7) Classes of Claims and Interests. There are five (5) Classes of Secured Claims, one (1) Class of Unsecured Claims, and one (1) Class of Equity Interests.

Overall, the Plan provides that Holders of Allowed Administrative Claims will be paid in full on the Effective Date from the Sale. Holders of Allowed Priority Tax Claims will receive Payments from the Sale.

Holders of the Allowed Unsecured Claims in Class 6 shall receive, in full satisfaction of their Allowed Unsecured Claims, *Pro Rata* distribution from the Net Adversary Proceeds. The Class 7 Equity Interest is Unimpaired, since upon the Effective Date, all currently issued or authorized Equity Interests in the Debtor shall remain unchanged. All Classes, except Class 7 is impaired under the Plan.

B.     Classification and Treatment of Claims.

1.     Priority Claims.

a.     Administrative Expense Claims.

Holders of all Allowed Administrative Expense Claims of the Debtor shall be paid in full on the Effective Date, or, if the Claim does not become Allowed prior to the

Effective Date, on the date the Allowed Amount of such claim is determined by Final Order of the Bankruptcy Court. However, nothing in this provision of the Plan shall preclude Debtor from paying any holder of a Nonordinary Course Administrative Claim less than one hundred percent (100%) of its Allowed Claim in Cash on the Effective Date provided that such Claim holder consents to different payment terms. Debtor estimates Administrative Claims to be approximately $50,000 (excluding any amounts owed under the DIP Loans).

        b.    <u>Priority Tax Claims.</u>

Except to the extent that the Holder and the Debtor have agreed or may agree to a different treatment, each Holder of an Allowed Priority Tax Claim shall be paid by the Debtor, from the proceeds of the Sale, on the Effective Date.

        2.    <u>Secured Claims.</u>

        a.    <u>Class 1 – Pentagon Apollo DIP Lender (SF).</u>

Class 1 consists of the Allowed Secured Claim of Pentagon Apollo in respect of its DIP Loan to Sherwood Farms. The Claim is secured by a superpriority mortgage lien upon and security interest in all assets of Sherwood Farms (collectively, the "DIP Lender's Property"). Until the Sale, DIP Lender shall retain a superpriority lien on the DIP Lender's Property. Upon closing of the Sale, the DIP Lender's liens shall be transferred to the Sale Proceeds.

In full satisfaction of its Allowed Class 1 Claim, DIP Lender shall receive net proceeds from the Sale after payment of closing costs, Allowed Administrative Claims, and *ad valorem* real estate taxes. It is expected that the Sale will produce sufficient proceeds to pay 100% of the Allowed Class 1 Claim. To the extent the assets are sold via a credit bid to Centennial or any other mortgage holder, the Class 1 Claim will be paid by such credit-bid purchaser.

b.      <u>Class 2 – Centennial Bank, f/k/a Old Southern Bank</u>.

Class 2 consists of the Allowed Secured Claim of Centennial. The Claim is secured by liens on all real and personal property of Sherwood Farms (collectively, the "Centennial Bank Property"). Until the Sale, Centennial shall retain a first mortgage and priority lien on the Centennial Bank Property. Upon closing of the Sale, Centennial's liens shall be transferred to the Sale Proceeds.

In full satisfaction of its Allowed Class 2 Claim, Centennial shall receive net proceeds from the Sale after payment of closing costs, Allowed Administrative Claims, *ad valorem* real estate taxes, and the Allowed Class 1 Claim. It is expected that the Sale will not produce sufficient proceeds to pay 100% of the Allowed Class 2 Claim. Centennial will have an Allowed Class 6 Claim for any deficiency.

c.      <u>Class 3 – Pentagon Apollo, Ltd. – Sherwood Farms</u>

Class 3 consists of the Allowed Secured Claim of Pentagon Apollo, Ltd. in respect of its prepetition loan to Sherwood Farms. The Class 3 Claim is secured by a second mortgage on Sherwood Farm's real property (the "Pentagon Property"). Until the Sale, Pentagon Apollo shall retain a second mortgage lien on the Pentagon Property. Upon closing of the Sale, Pentagon Apollo's lien shall be transferred to the Sale Proceeds to the extent sufficient proceeds exist.

Because the Class 3 Claim is fully subordinate to Centennial, the entire Class 3 Claim, pursuant to Bankruptcy Code § 506, is likely Unsecured. Accordingly, Pentagon Apollo shall receive a Claim in Class 6 in an amount equal to the Allowed amount of its Class 3 Claim.

d.     <u>Class 4 – SIO</u>

Class 4 consists of the Allowed Secured Claim of SIO in respect of its prepetition loan to Sherwood Farms. The Class 4 Claim is secured by a third mortgage on Sherwood Farm's real property (the "SIO Property"). Until the Sale, SIO shall retain a third mortgage lien on the SIO Property. Upon closing of the Sale, SIO's lien shall be transferred to the Sale Proceeds to the extent sufficient proceeds exist.

Because the Class 4 Claim is fully subordinate to Centennial, the entire Class 4 Claim, pursuant to Bankruptcy Code § 506, is likely Unsecured. Accordingly, SIO shall receive a Claim in Class 6 in an amount equal to the Allowed amount of its Class 4 Claim.

e.     <u>Class 5 – Lake County Tax Collector</u>.

Class 5 consists of the Allowed Secured Claims of the Lake County Tax Collector ("Tax Collector"), which are secured by a first priority Tax Lien on Sherwood Farms' real property.

In full satisfaction of its Allowed Secured Claims, the Tax Collector shall retain its Liens against the applicable Real Property and receive net proceeds from the Sale after payment of closing costs and Allowed Administrative Claims. It is expected that the Sale will produce sufficient proceeds to pay 100% of the Allowed Class 2 Claim. To the extent the assets are sold via a credit bid, the Class 5 Claim will be paid by the credit-bid purchaser.

3.     <u>Unsecured Claims</u>.

<u>Class 6 – Allowed Unsecured Claims</u>.

Class 6 consists of all Allowed Unsecured Claims of the Debtor including asserted Secured Claims which, by virtue of Bankruptcy Code § 506, will be partially or entirely

Unsecured. In full satisfaction of the Allowed Class 6 Claims, holders of such claims shall receive their *pro rata* share of the Net Adversary Proceeds after payment in full to the DIP Loan Claim against SIO and the prepetition secured loan from Pentagon Apollo to SIO. Should judgment of the ABN Adversary be granted in favor of SIO or should the parties to the Adversary Proceeding settle such that an award is made in favor of SIO (the "Adversary Proceeds"), then the Net Adversary Proceeds shall be distributed by SIO to holders of Allowed Class 6 Claims on a *pro rata* basis.

    4.    <u>Equity Interests</u>.

    <u>Class 7 – Equity Interests of Sherwood Farms, Inc.</u>

Class 7 consists of any equity issued or authorized in Sherwood Farms. All currently issued and outstanding equity interests in Sherwood Farms shall be retained by their respective holders.

    C.    <u>Means of Implementation</u>.

    1.    <u>Business Operations and Cash Flow</u>.

The Plan contemplates that Reorganized Sherwood Farms shall exist only to consummate the Sale and distribute proceeds according to the Plan. The Sale will be conducted pursuant to the Sale Procedures and the Net Adversary Proceeds used to pay all Allowed Administrative Claims, all Allowed *ad valorem* real property claims (Class 5), and the Allowed Class 1 and 2 Claims to the extent of the proceeds. SIO will pursue the action against ABN.

    2.    <u>Funds Generated During Chapter 11</u>.

All cash in excess of operating expenses generated from operations until the Effective Date will be used for Plan Payments.

3.    Reorganized Debtor.

After Confirmation, the common stock of the Equity Holder shall remain in full force and effect as set forth herein. The current officers and directors shall remain in respect of the Reorganized Debtor.

4.    Management and Control of Sherwood Farms.

(i).    Directors.

The operations of Sherwood Farms shall be overseen by its Board of Directors. The Board of Directors shall have the power to request and obtain all financial data and operation information regarding the Reorganized Debtor at any time. The Board of Directors shall have all corporate authority vested in boards of directors under the applicable laws of the State of Florida including the power to appoint and terminate officers and to liquidate the Reorganized Debtor and to wind up its affairs, with all such powers to be exercised by a majority vote.

Julian Benscher shall serve as Chairman of the Board. The initial Directors shall continue to serve until either (i) the Reorganized Debtor ceases to do business, or (ii) a Director resigns or is replaced by the shareholders in accordance with Florida law. The Directors shall be entitled to receive reasonable compensation.

(ii).    Officers.

No officer of any Reorganized Debtor shall have the authority to sell substantially all of the assets of Reorganized Debtor or to liquidate Reorganized Debtor unless a majority of the Directors of the Reorganized Debtor approves such actions. Should a majority of the Directors of the Reorganized Debtor instruct the officers of any Reorganized Debtor to take such actions, the officers of Reorganized Debtor shall follow such instructions to the best of their abilities.

Julian Benscher shall be the initial Chief Executive Officer and President of Sherwood Farms. After discussions with several of the Debtor's secured creditors, it is Sherwood Farms' belief that the continued involvement of the officers is a condition precedent to the concessions received herein from the secured creditors and lenders and is crucial go-forward success.

The President shall have authority to conduct the operations of Reorganized Debtor and shall delegate such authority to other officers as the Board of Directors may direct. The President, and other officers of the Reorganized Debtor shall have the powers, duties, and responsibilities typically held by such officers in companies similar to the Reorganized Debtor and, in addition, shall be responsible for promptly providing any Director with all information regarding the Reorganized Debtor which such Director may request. The officers of the Reorganized Debtor shall be entitled to reasonable compensation as determined by respective management contracts, and, if not contract exists, as fixed by the Board of Directors.

     5.    <u>Disbursements</u>.

All Disbursements made pursuant to this Plan shall be paid by the Reorganized Debtor from the proceeds of the Sale.

    D.    <u>Other Provisions</u>.

     1.    <u>Leases and Executory Contracts</u>.

The Plan provides that the Debtor shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not expressly assumed by such date, then such unexpired lease or executory contract shall be deemed rejected. It is the position of the Debtor that the executory contracts listed in the respective

Schedules of Executory Contracts filed pursuant to Rule 1007, are the only executory contracts to which the Debtor was a party on the Petition Date. The Plan also provides for the Bankruptcy Court to retain jurisdiction as to certain matters as stated in the Plan, including, without limitation, prosecution of all Causes of Action and objections to Claims.

To the extent any executory contract or lease is rejected by operation of this provision, any party asserting a Claim, pursuant to Sections 365 and 502(g) of the Code, arising from such rejection shall file a proof of such Claim within thirty (30) days after the entry of an Order Confirming the Plan, and any Allowed Claim resulting from such rejection shall be a Class 6 Claim except as otherwise provided herein.

2.    <u>Procedures For Resolving Disputed Claims</u>.

a.    <u>Prosecution of Objections to Claims</u>.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as otherwise provided in the Plan, the Debtor or Reorganized Debtor shall have the exclusive right to make and file objections to all Claims. All objections commenced prior to Confirmation Date shall be finished by the Reorganized Debtor.

Pursuant to the Plan, unless another time is set by order of the Bankruptcy Court, all objections to Claims and Equity Interests shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims and Equity Interests to which objections are made within 90 days after the Confirmation Date.

Except as may be specifically set forth in the Plan, nothing in the Plan, the Disclosure Statement, the Confirmation Order or any order in aid of Confirmation, shall

constitute, or be deemed to constitute, a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that, any Debtor had immediately prior to the commencement of the Chapter 11 Case, against or with respect to any Claim or Equity Interest. Except as set forth in the Plan, upon Confirmation, the Reorganized Debtor shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that any Debtor had immediately prior to the commencement of the Chapter 11 Cases as if the Chapter 11 Cases had not been commenced.

b.    <u>Estimation of Claims</u>.

Pursuant to the Plan, the Debtor may, at any time, request that the Bankruptcy Court estimate any contingent, disputed or unliquidated Claim pursuant to Section 502(c) of the Code regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, disputed or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

c.    <u>Cumulative Remedies</u>.

In accordance with the Plan, all of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Until such time as an Administrative Claim, Claim or Equity Interest becomes an Allowed Claim, such Claim shall be treated as a Disputed Administrative Claim, Disputed Claim or Disputed Equity Interest for purposes related to allocations, Distributions, and voting under the Plan.

d.    <u>Payments and Distributions on Disputed Claims</u>.

As and when authorized by a Final Order, Disputed Claims that become Allowed Claims shall be paid by the Reorganized Debtor, such that the Holder of such Allowed Claim receives all payments and Distributions to which such Holder is entitled under the Plan in order to bring payments to the affected Claimants current with the other participants in the particular Class in questions. Except as otherwise provided in the Plan, no partial payments and no partial Distributions will be made with respect to a Disputed Claim until the resolution of such disputes by settlement or Final Order. Unless otherwise agreed by the Reorganized Debtor or as otherwise specifically provided in the Plan, a Creditor who holds both an Allowed Claim and a Disputed Claim will not receive a Distribution until such dispute is resolved by settlement or Final Order.

e.     Allowance of Claims and Interests.

(i).     Disallowance of Claims.

According to the Plan, all Claims held by Entities against whom a Debtor has obtained a Final Order establishing liability for a cause of action under Sections 542, 543, 522(f), 522(h), 544, 545, 547, 548, 549, or 550 of the Code ("Causes of Action") shall be deemed disallowed pursuant to Section 502(d) of the Code, and Holders of such Claims may not vote to accept or reject the Plan, both consequences to be in effect until such time as such causes of action against that Entity have been settled or resolved by a Final Order and all sums due the Debtor by that Entity are turned over to such Debtor.  Debtor reserves and shall have the exclusive right and authority to bring any Causes of Action.

(ii).     Allowance of Claims.

Except as expressly provided in the Plan, no Claim or Equity Interest shall be deemed Allowed by virtue of the Plan, Confirmation, or any Order of the Bankruptcy Court in the Chapter 11 Case, unless and until such Claim or Equity Interest is deemed Allowed under the Code or the Bankruptcy Court enters a Final Order in the Chapter 11 Case allowing such Claim or Equity Interest.

f.     Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Equity Interests or any Class of Claims or Equity Interests are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before the Confirmation Date.  If such

controversy is not resolved prior to the Effective Date, the Debtor's interpretation of the Plan shall govern.

3.     <u>Effect of Confirmation</u>.

a.     <u>Authority to Effectuate the Plan</u>.

Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides all matters provided under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Confirmation Order will act as an order modifying the Debtor's by-laws such that the provisions of this Plan can be effectuated. The Reorganized Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve Consummation and carry out the Plan.

b.     <u>Post-Confirmation Status Report</u>. Pursuant to the Plan, within 120 days of the entry of the Confirmation Order, the Debtor will file status reports with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan. The status report will be served on the United States Trustee, and those parties who have requested special notice post-confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## IV.   **CONFIRMATION**

A.     <u>Confirmation Hearing</u>.

Section 1128 of the Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time

without further notice except for an announcement to be made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to Confirmation Hearing:

<u>Counsel for the Debtor</u>:

R. Scott Shuker, Esquire
Latham, Shuker, Eden & Beaudine, LLP
390 N. Orange Avenue, Suite 600
Orlando, Florida 32801

<u>Debtor</u>:

Sherwood Farms, Inc.
c/o Julian Benscher
13613 Honeycomb Rd.
Groveland, FL 34736

<u>United States Trustee</u>:

135 West Central Blvd.
Suite 620
Orlando, Florida 32801

B.      <u>Financial Information Relevant to Confirmation</u>.

Debtor has not prepared a financial projection because the Plan calls for Liquidation and, thus, projections are not relevant. Likewise, Debtor has not completed a liquidation analysis as the property will be liquidated without the expense of a Chapter 7 Trustee and, as such, creditors are receiving more then they would in Chapter 7.

C.      <u>Confirmation Standards</u>.

For a plan of reorganization to be confirmed, the Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the

Code. Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept the plan, that confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the requirements enumerated in Section 1129 of the Code have been met. Debtor believes that the Plan satisfies all of the requirements for Confirmation.

      1.    <u>Best Interests Test</u>.

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Interest of such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if Debtor was, on the Effective Date, liquidated under Chapter 7 of the Code. Debtor believes that satisfaction of this test is established by the Sale without the extra expense of a Chapter 7 Trustee.

To determine what holders of Claims and Equity Interests would receive if Debtor was liquidated, the Bankruptcy Court must determine how the assets and properties of Debtor would be liquidated and distributed in the context of a Chapter 7 liquidation case.

Debtor's costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such

trustee and any unpaid expenses incurred by Debtor during the Chapter 11 Cases, including

compensation of attorneys and accountants. The additional costs and expenses incurred by a trustee

in a Chapter 7 liquidation could be substantial and would decrease the possibility that Unsecured

Creditors and holders of Equity Interests would receive meaningful distributions. The foregoing

types of Claims arising from Chapter 7 administration and such other Claims as may arise in

Chapter 7 or result from the pending Chapter 11 Cases would be paid in full from the liquidation

proceeds before the balance of those proceeds would be made available to pay the Claims of

Unsecured Creditors. Liquidation in Chapter 7 might substantially delay the date at which Creditors

would receive any Payment.

    Debtor has carefully considered the probable effects of liquidation under

Chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Equity

Interests, including the following:

    a.  the possible costs and expenses of the Chapter 7 trustee or trustees;

    b.  the possible adverse effect on recoveries by Creditors under Chapter 7

due to reduced sale prices for Debtor's assets caused by the forced Chapter 7 liquidation; and

    c.  the possible substantial increase in Claims, which would rank prior to

or on a parity with those of Unsecured Creditors.

    2.  <u>Financial Feasibility</u>.

    The Code requires, as a condition to Confirmation, that Confirmation of a

plan is not likely to be followed by the liquidation, or the need for further financial reorganization,

of Debtor unless the liquidation is proposed in the Plan. Because liquidation is proposed this test is satisfied.

3.     Acceptance by Impaired Classes.

The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds ($^2/_3$) in dollar amount and more than one-half ($\frac{1}{2}$) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds ($^2/_3$) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless (i) the legal, equitable and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the holder is entitled.

4.  Confirmation Without Acceptance by all Impaired Classes; "Cramdown."

The Code contains provisions that enable the Bankruptcy Court to confirm the Plan, even though the Plan has not been accepted by all Impaired Classes, provided that the Plan has been accepted by at least one Impaired Class of Claims. Section 1129(b)(1) of the Code states:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly, and it is fair and equitable with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan.

**DEBTOR BELIEVES THAT, IF NECESSARY, IT WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE CODE WITH RESPECT TO THE NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

D.  Consummation.

The Plan will be consummated and Payments made if the Plan is Confirmed pursuant to a Final Order of the Bankruptcy Court, the Effective Date occurs, and the Debtor, the Reorganized Debtor and applicable parties reach agreement on any required documents. It will not be necessary for the Reorganized Debtor to await any required regulatory approvals from agencies

or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Code.

E.      Exculpation from Liability.

The Debtor, the Reorganized Debtor, their respective members, Managers, Officers and directors, and their respective Professionals (acting in such capacity) shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the plan or the Reorganization Case; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to the Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Reorganization Case. The rights granted hereby are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtor, the Reorganized Debtor, and their respective agents have or obtain pursuant to any provision of the Code or other applicable law, or any agreement. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions hereof shall not release or be deemed a release of any of the Causes of Action otherwise

preserved by the Plan. The terms of this exculpation shall only apply to liability arising from actions taken on or prior to the Effective Date.

**ANY BALLOT VOTED IN FAVOR OF THE PLAN SHALL ACT AS CONSENT BY THE CREDITOR CASTING SUCH BALLOT TO THIS EXCULPATION FROM LIABILITY PROVISION. MOREOVER, ANY CREDITOR WHO DOES NOT VOTE IN FAVOR OF THE PLAN MUST FILE A CIVIL ACTION IN THE BANKRUPTCY COURT ASSERTING ANY SUCH LIABILITY WITHIN THIRTY (30) DAYS FOLLOWING THE EFFECTIVE DATE OR SUCH CLAIMS SHALL BE FOREVER BARRED.**

Notwithstanding the foregoing, (i) the Reorganized Debtor shall remain obligated to make payments to Holders of Allowed Claims as required pursuant to the Plan and (ii) the Debtor's respective members, Managers or executive officers shall not be relieved or released from any personal contractual liability except as otherwise provided in the Plan.

F.      Police Power.

Nothing in this Article IV shall be deemed to effect, impair, or restrict any federal or state governmental unit from pursuing its police or regulatory enforcement action against any person or entity, other than to recover monetary claims against the Debtor for any act, omission, or event occurring prior to Confirmation Date to the extent such monetary claims are discharged pursuant to Section 1141 of the Code.

G.      Revocation and Withdrawal of this Plan.

The Debtor reserves the right to withdraw this Plan at any time before entry of the Confirmation Order. If (i) the Debtor revokes and withdraws this Plan, (ii) the Confirmation Order is not entered, (iii) the Effective Date does not occur, (iv) this Plan is not substantially

consummated, or (v) the Confirmation Order is reversed or revoked, then this Plan shall be deemed null and void.

H.      Modification of Plan.

The Debtor may seek to amend or modify this Plan in accordance with Section 1127(b) of the Code, remedy any defect or omission, or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

On or before substantial consummation of the Plan, the Debtor, may issue, execute, deliver or file with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

## V.      **ALTERNATIVE TO THE PLAN.**

If the Plan is not confirmed and consummated, Debtor believe that the most likely alternative is a sale of the Debtor or a liquidation of the Debtor under Chapter 7 or 11 of the Code. In a liquidation or sale, Debtor believes the deficiency claims from the secured lenders could be as much as $10,000,000, and, as such, the pool of Allowed Unsecured (Class 6) Claims would be increased and the dividend to such group greatly diminished. Debtor believes that liquidation of all real and personal property in a Chapter 7 scenario would dramatically reduce the total amount available to Creditors. In a case under Chapter 7 of the Code, a trustee would be elected or appointed to liquidate the assets of Debtor for distribution to Creditors in accordance with the priorities established by the Code.

## VI.    <u>CONCLUSION</u>.

Debtor recommends that holders of Claims and Interests vote to accept the Plan.

**DATED** this 17th day of December 2010 in Orlando, Florida.

/s/ R. Scott Shuker
R. Scott Shuker
Florida Bar No: 984469
rshuker@lseblaw.com
Victoria Kothari
Florida Bar No. 0730831
vkothari@lseblaw.com
**LATHAM, SHUKER, EDEN & BEAUDINE, LLP**
390 N. Orange Avenue, Suite 600
Orlando, Florida 32801
Tel: 407-481-5800
Fax: 407-481-5801
*Attorneys for Debtor*